*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STANLEY DROOMER and RICHARD DUKE,

        Plaintiffs-Appellants,

v

FLEX-N-GATE DETROIT, LLC, JEROME
CURTIS, and JOE MACVICAR,

        Defendants-Appellees.

UNPUBLISHED
October 28, 2021

No. 355117
Wayne Circuit Court
LC No. 19-009727-CZ

Before: STEPHENS, P.J., and SAWYER and SERVITTO, JJ.

PER CURIAM.

        Plaintiffs, Stanley Droomer and Richard Duke, appeal as of right the trial court's order granting summary disposition, in this race-based employment discrimination case, in favor of defendants, Flex-N-Gate Detroit, LLC (FNG Detroit), Jerome Curtis, and Joe MacVicar. We affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

        This case concerns allegations that the termination of plaintiffs, two Caucasian men, from their employment with FNG Detroit, the operator of an automotive parts manufacturing plant in Detroit, Michigan, was the result of racial discrimination. Droomer was the third shift supervisor and Duke was the second shift supervisor. Droomer was instrumental in Duke's hire. Droomer was hired in September 2018 and recruited Duke to join the FNG staff a month later. Droomer reported to Sawn Adelsberger, general manager at FNG Detroit from May 2018 until May 2019. At the time of the termination, Droomer reported to the plant manager, Mac Vicar.

        In mid-April 2019, KH, a team leader with FNG Detroit, reported to Curtis, then-HR Manager of FNG Detroit, that Droomer sexually harassed her and inappropriately touched her. KH's allegations included Droomer hitting her buttocks on multiple occasions, including a time that caused her eyes to tear up, touching her shoulders and back, and making comments about her buttocks. KH also reported that Duke repeatedly made sexual comments to her, but "never touched [her]." KH also informed Curtis of KS, another FNG Detroit team leader, who experienced similar conduct from plaintiffs. KS indicated the " he [Droomer] popped [her] on the butt with a . . .

-1-

water bottle." KS alleged that once she became a team leader, and Duke was her immediate supervisor, he directed sexual comments to her, including comments about her breasts. FNG Detroit had a company policy prohibiting harassment and providing examples of prohibited behavior. Those examples included unwelcome "physical contact or touching of a sexual nature" and verbal abuse, including "offensive jokes or sexual innuendos and degrading comments[.]" The sexual-harassment policy also stated: "Any employee found to have engaged in conduct inconsistent with this practice will be subject to discipline, up to and including discharge." Both Droomer and Duke signed the harassment policy when they were first hired by FNG Detroit.

Once KH and KS reported plaintiffs' conduct to Curtis, the HR director, he initiated an investigation. As part of that investigation, Curtis spoke with two other FNG Detroit employees who witnessed plaintiffs' conduct, reviewed surveillance video, spoke with plaintiffs individually, and followed up with KH and KS after speaking with plaintiffs. Plaintiffs denied any such harassment took place. Once Curtis completed his investigation, he provided his notes to, then-Director of Human Resources (HR), Karrie Szalony. Szalony, in concert with Stephen Bopra, the Executive Director of HR for Flex-N-Gate Group of Companies, the parent company of FNG Detroit, and Randy Marko, Vice President of HR, reviewed the findings of the investigation and concluded plaintiffs should be terminated. Curtis informed plaintiffs individually that their employment with FNG Detroit was terminated because of the sexual harassment.

Plaintiffs filed a one-count complaint against defendants alleging various violations of the Civil Rights Act (CRA), MCL 37.2201 *et seq*. Plaintiffs' allegations focused on "impermissible considerations of race" in the termination of plaintiffs' employment. Defendants moved for summary disposition. Defendants argued plaintiffs could not establish their claims of racial discrimination against FNG Detroit with either direct or circumstantial evidence. They argued that plaintiffs' claims against Curtis and MacVicar as individuals failed because neither man was FNG Detroit's agent. Plaintiffs responded, asserting they could satisfy the requirements of a racial discrimination claim under either a direct-evidence or circumstantial-evidence theory. Plaintiffs asserted that FNG considered race in its hiring and promotional decision relying on management statements that FNG Detroit "aspired to hire Detroit residents when possible." The defendant acknowledged that, FNG Detroit, under the direction of Szalony, initially prioritized applications for hourly production workers based on zip codes and area codes. Plaintiffs argued statements from various management-level employees of FNG Detroit regarding a desire to hire more African-Americans gave rise to an inference of unlawful discrimination. Plaintiffs also asserted defendants' reason for terminating plaintiffs' employment, the results of the sexual-harassment investigation, was fabricated. Plaintiffs argued summary disposition was inappropriate and that the case had to be submitted to a jury.

The trial court concluded plaintiffs' claims failed because they could not "establish the fo[u]rth prong of the prima facie case." The trial court found plaintiffs failed to "identify similarly situated non-Caucasian individuals who were not terminated after violating the harassment policy." The trial court noted FNG Detroit's contention that "no such employees exist[ed] and no other members of management of any race have been determined to have violated the harassment policy." Further, the trial court acknowledged defendants' evidence, and plaintiffs' failure to rebut that evidence, indicating neither plaintiff was replaced after their termination. Moreover, the trial court stated that, even if it assumed the employer was mistaken and no sexual harassment occurred, "the fact remains that the employer conducted an investigation, concluded a policy had been

violated, [and] made a business decision to terminate [p]laintiffs based on the belief they violate[d] the policy." The trial court concluded plaintiffs failed to present evidence that the decision to terminate their employment was a pretext for race discrimination. The trial court found the statements presented by plaintiffs were "general statements about diversity" and did not demonstrate an intent "to fire Caucasian employees and hire[] . . . an African-American or a[n] employment of another race to substitute that would support any pretext in this particular" case. Therefore, the trial court concluded that, "without any support for [an] alternate [reason] motivating [the] decision [to terminate plaintiffs], [there was] insufficient evidence [presented] on the part of the [p]laintiffs" and, "for that reason[,] the Court would grant summary disposition." This appeal followed.

## II. EMPLOYMENT DISCRIMINATION

Plaintiffs argue the trial court erred in granting summary disposition of their race discrimination claims. We disagree.

## A. STANDARD OF REVIEW

This Court reviews a trial court's decision whether to grant or deny a motion for summary disposition de novo. *Ingham Co v Mich Co Rd Comm Self-Ins Pool*, 321 Mich App 574, 579; 909 NW2d 533 (2017), remanded on other grounds by 503 Mich 917 (2018).

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999) (citations and quotation marks omitted).]

"The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10)." *Hastings Mut Ins Co v Grange Ins Co of Mich*, 319 Mich App 579, 583-584; 903 NW2d 400 (2017) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Cr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016). Further, the opposing party may not rest upon mere denials, but must, by affidavits or other admissible evidence, "set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).

## B. DIRECT EVIDENCE

Plaintiffs argue the trial court erred in granting summary disposition of their race discrimination claim against FNG Detroit because there was direct evidence of racial discrimination. Plaintiffs assert that because this direct-evidence case involved mixed motives, the case should have been automatically submitted to the jury. We disagree.

In Michigan, the "[CRA] prohibits employers from discriminating on the basis of race[.]" *White v Dep't of Transp*, 334 Mich App 98, ___; 946 NW2d 88 (2020) slip op at 3; see also MCL 37.2202(1)(a). The relevant statutory provision, MCL 37.2202(1)(a), states:

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

"The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016). "In some discrimination cases, the plaintiff is able to produce direct evidence of racial bias. In such cases, the plaintiff can go forward and prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id*. That is, direct evidence is "evidence that proves impermissible discriminatory bias without additional inference or presumption." *Hecht*, 499 Mich at 608 n 34. In *Hecht*, our Supreme Court explained that the "hallmarks" of a case involving direct evidence of discrimination as a motivating factor for an adverse employment action are "a statement made by a decision-maker, to the plaintiff, at the meeting in which the plaintiff suffered the adverse employment action, and evincing a causal nexus." *Id*.

Plaintiffs, however, argue this case involves mixed motives. In a direct-evidence case involving mixed motives, i.e., where "the adverse employment decision could have been based on both legitimate and legally impermissible reasons," a plaintiff "must prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor in the decision." *Sniecinski v Blue Cross and Blue Shield of Mich*, 469 Mich 124, 133; 666 NW2d 186 (2003) (citation omitted). That is, the plaintiff must establish that "the defendant was predisposed to discriminating against members of the plaintiff's protected class" and that "the defendant actually acted on that predisposition in visiting the adverse employment action on the plaintiff." *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 360-361; 597 NW2d 250 (1999) (citation omitted). Once the plaintiff meets the initial burden of establishing the illegal conduct "was more likely than not a substantial or motivating factor in the defendant's decision, a defendant has the opportunity to show by a preponderance of the evidence that it would have reached the same decision without consideration of the protected status." *Downey v Charlevoix Co Bd of Co Rd Comm'rs*, 227 Mich App 621, 634; 576 NW2d 712 (1998).

Here, plaintiffs claim the "race-based comments and statements" in this case demonstrate direct evidence of racial discrimination and, when coupled with FNG Detroit's reason for plaintiffs' termination—the results of the sexual-harassment investigation—this establishes a mixed-motive case. Plaintiffs cited comments from management personnel regarding the absence of African Americans in executive and other positions supported the existence of racial animus. Plaintiffs assert defendants "openly admitted and repeated frequently that they were seeking 'Detroiters', a euphemism for African-Americans." To substantiate this statement, plaintiffs'

-4-

reference "numerous articles attached as Ex. 3." However, nowhere in the news articles plaintiffs' reference does it state that "Detroiters" is a euphemism for African-Americans.[1] Indeed, the articles repeatedly state that the initiative to hire "Detroiters" was to hire Detroit residents when possible. Moreover, Droomer and Duke admitted during their depositions that Detroiters are white and black. Droomer testified, however, about a conversation he had with Adelsberger regarding the term "Detroiters":

> *Q.* Do you equate the word Detroiters with individuals who are black or African American?
>
> *A.* No, they're just Detroiters, they're people.
>
> *Q.* Okay. Did anybody in management say to you that they were equating the word Detroiters with blacks or African Americans?
>
> *A.* I don't know if it was the exact words of saying that we need to be 80 percent black. They didn't say them [sic] words. But in reference to a lot of Detroiters, their references were as of [sic] black nature, yes.
>
> *Q.* Okay. Who made a reference that caused to you answer that question that way?
>
> *A.* There [were] conversations with [Adelsberger].
>
> *Q.* What did [Adelsberger] say?
>
> *A.* I'm trying to think of[—]We were in his office and he was just[—]Because he's not from around here, he's from down South. He was asking, "Are all Detroiters black?"
>
> And I said, "No." I said, "It's mixed."
>
> He's like, "We're in the ghetto of Detroit, and that seems to be all that's around here."
>
> It was more of just a general conversation that he was having with me.
>
> *Q.* Okay. Did you say anything else about that general conversation?

---

[1] There is only one mention of "African-Americans" in the 19 pages of news articles plaintiffs attached as an exhibit to their response to defendants' motion for summary disposition. That reference states: "How can you have a revitalization or comeback in Detroit if the residents, who are 80 percent African-American, are not benefiting from it? That is why Flex-N-Gate having a 50 percent Detroit-based workforce at its new production plant on the city's east side is integral to the city's redevelopment."

*A.* No. I mean, just that it's mixed, we've got white, black, they're all over.

Yeah, we are in the ghetto, I agreed with that, because there [were] so many abandoned houses around there that they needed to burn them down.

MacVicar also addressed the term "Detroiters" at his deposition, indicating the "only person [he] recall[ed] ever saying ['Detroiters']" was Szalony. MacVicar "assumed" Detroiters meant "from the area," "whether it was geographically or the area code, I don't know."

Plaintiffs also referenced statements by Adelsberger and MacVicar that plaintiffs claim demonstrate FNG Detroit favored employing African-Americans over Caucasians. Specifically, Droomer testified that, when he was first-shift superintendent, Adelsberger talked with him about "not having enough black supervisors in here, and when he walks in the front office everyone up here is white, we need to get more blacks into the front office and in supervision." Droomer stated that Adelsberger asked him if he " 'kn[e]w any black supervisors that we could hire in[.]' " Adelsberger, on the other hand, denied ever hearing anyone in a management position with FNG Detroit say the company " 'need[ed] to get more blacks into management, or African Americans . . . .' " When asked whether he heard representatives from an automobile company comment that FNG Detroit needed to "hire more diversely," Adelsberger stated:

There was never a direct comment made. There was one particular board meeting where a comment was made that the representation of the management leadership was not representative of the work force, and that it was something that Ford strived to do internally. It was mentioned at a meeting. It was not discussed any further after that.

Droomer also testified about comments made by MacVicar regarding hiring African-Americans as supervisors. Droomer stated MacVicar made "statements that we need to get more black supervisors in here, we need to look at promoting some of the black people on the shop floor," and "wonder[ed] if we had any of the black people on the shop floor that are promotable that we can move up." Droomer also testified that he questioned MacVicar regarding "[w]hy we're pushing . . . supervisors in that haven't passed their background checks," and MacVicar answered, " 'We're trying to get more African Americans in here.' " Duke also testified that at some point in 2018, MacVicar told him they were " 'gonna [sic] get you some more help' " for the third shift and, when Duke asked for clarification regarding the meaning of "help," MacVicar stated, " 'Some black supervisors.' " Additionally, Duke testified that at a "town hall meeting[]," MacVicar stated FNG Detroit was "booming and they wanted more Detroiters in there." Droomer and Duke acknowledged that "Detroiters" are both white and black. Additionally, Duke conceded that although MacVicar indicated he was going to "get some black supervisors '[t]o help us out,'" MacVicar never told Duke they were going to get rid of white supervisors. Additionally, MacVicar testified about a visit from a representative from Ford who "made references to the fact that we [FNG Detroit] were in Detroit and everybody in the boardroom upstairs we were all white." MacVicar stated the representative made "something along the lines of a suggestion and when we [Ford] diversified in a couple of our plants we had better results."

As the trial court found, the statements plaintiffs identified are "general statements about diversity" and simply observations by FNG Detroit management regarding the makeup of their

management-level staff. Plaintiffs failed to establish by direct evidence that the discriminatory animus FNG Detroit allegedly had toward Caucasians was more likely than not a substantial or motivating factor in the decision to terminate plaintiffs' employment. *Sniecinski*, 469 Mich at 133. Further, as the trial court found, plaintiffs failed to identify any statements "indicating that the intention was to fire Caucasian employees and hire[] . . . an African-American or a[n] employee of another race to substitute . . . ." The mere fact statements were made about hiring more African-Americans does not demonstrate FNG Detroit sought to terminate Caucasian employees to accomplish that goal. And, it appears that use of the term "Detroiters" referred to residents of the city of Detroit (whether determined by area code or zip code), and has only been used by plaintiffs, no one else, as a euphemism for African-Americans (despite acknowledgment from both plaintiffs that Detroiters are white and black). Therefore, plaintiffs failed to present direct evidence of racial discrimination and could not avoid summary disposition on this basis. Accordingly, if plaintiffs are to be successful in establishing their claims for racial discrimination against FNG Detroit, it must proceed under the burden-shifting framework articulated in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

## C. INDIRECT EVIDENCE AND THE *MCDONNELL DOUGLAS* BURDEN-SHIFTING FRAMEWORK

Plaintiffs argue the trial court erred in granting summary disposition of their claim for race discrimination against FNG Detroit because there was circumstantial evidence of racial discrimination. We disagree.

Where "there is no direct evidence of impermissible bias, [the] plaintiff's claim of intentional discrimination must proceed under the *McDonnell Douglas* burden-shifting framework." *White*, 334 Mich App at ___; slip op at 3 (quotation marks, citation, and footnote omitted). To establish a prima facie case of discrimination under *McDonnell Douglas*, plaintiffs must show that (1) they were members of a protected class; (2) they suffered an adverse employment action, such as discharge; (3) they were qualified for their positions; but (4) they were discharged under circumstances that give rise to an inference of unlawful discrimination. *Lytle v Malady (On Rehearing)*, 458 Mich 153, 172-173; 579 NW2d 906 (1998).

If a plaintiff sufficiently establishes a prima facie case under *McDonnell Douglas*, a rebuttable presumption of discrimination arises. *Hazle*, 464 Mich at 463-464. The defendant can rebut this presumption by articulating "a legitimate, nondiscriminatory reason for its employment decision." *Id.* at 464. "If the employer makes such an articulation, the presumption created by the *McDonnell Douglas* prima facie case drops away." *Id.* at 464-465 (footnote omitted). At that point, "the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *White*, 334 Mich App at ___; slip op at 4 (quotation marks and citation omitted).

Our Supreme Court in *Hazle*, 464 Mich at 465-466, explained:

> At that point, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is "sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer

toward the plaintiff." . . . [A] plaintiff "must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful] discrimination."

> The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision. The only difference is that, for purposes of a motion for summary disposition or directed verdict, a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision. [Citations omitted; second alteration in original.]

"There are multiple ways to prove that a plaintiff was the victim of unlawful discrimination." *Hecht*, 499 Mich at 607. "A plaintiff can establish that a defendant's articulated legitimate, nondiscriminatory reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Major v Village of Newberry*, 316 Mich App 527, 542; 892 NW2d 402 (2016) (quotation marks and citation omitted). Further,

> A plaintiff can attempt to prove discrimination by showing that the plaintiff was treated unequally to a similarly situated employee who did not have the protected characteristic. An employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race [or gender], can give rise to an inference of unlawful discrimination. In order for this type of "similarly situated" evidence alone to give rise to such an inference, however, our cases have held that the "comparable" employees must be "nearly identical" to the plaintiff in all relevant respects. [*Hecht*, 499 Mich at 608 (citations omitted).]

The "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.' " *Ercegovich v Goodyear Tire & Rubber Co*, 154 F3d 344, 352 (CA 6, 1998) (citation omitted); see also *Hecht*, 499 Mich at 608 ("[O]ur cases have held that the 'comparable' employees must be 'nearly identical' to the plaintiff in all relevant respects.") (citation omitted). Although this Court is not bound by federal precedent interpreting analogous questions under Title VII of the 1964 Civil Rights Act, but that caselaw is generally considered persuasive. *White*, 334 Mich App at ___; slip op at 6. Courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich*, 154 F3d at 352.

Plaintiffs claim that statements made by company leadership regarding plans to "get rid of white management and replace them with African-Americans/blacks," would give rise to an inference of unlawful discrimination. However, as discussed, the statements plaintiffs presented regarding hiring more African-American supervisors do not establish FNG Detroit would terminate Caucasian employees to increase the number of African-American employees. In fact,

we were unable to locate any statements in the record supporting plaintiffs' claim that management planned to "get rid of white management" in order to "replace them with African-Americans/blacks." Instead, the record demonstrates the statements made, as the trial court found, were "general statements about diversity" and provided no indication there was an intention to fire Caucasian employees and hire African-Americans (or any other race or ethnicity) in place of the terminated Caucasian employees. As a result, plaintiffs failed to establish the fourth prong of the *McDonnell Douglas* burden-shifting framework, i.e., that they were discharged under circumstances that give rise to an inference of unlawful discrimination. *Lytle*, 458 Mich at 172-173. Thus, plaintiffs failed to establish a prima facie case of racial discrimination.

Even if the evidence presented by plaintiffs established they were discharged under circumstances giving rise to an inference of unlawful discrimination, defendants sufficiently rebutted this presumption by articulating a legitimate, nondiscriminatory reason for its decision to terminate plaintiffs—FNG Detroit's finding, after an investigation that involved complainants and witness interviews, and review of surveillance footage, that plaintiffs sexually harassed two female employees. *Hazle*, 464 Mich at 463-464. Because defendants sufficiently articulated a legitimate, nondiscriminatory reason for its decision to terminate plaintiffs' employment, "the presumption created by the *McDonnell Douglas* prima facie case drops away." *Id*. at 464-465 (footnote omitted). As a result, the burden shifted back to plaintiffs to show that defendants' "reasons were not the true reasons, but a mere pretext for discrimination." *White*, 334 Mich App at ___; slip op at 4 (quotation marks and citation omitted).

Plaintiffs assert that because they wholly deny they sexually harassed the two women, the trial court was required to accept their denials as true, and reject defendants' "stories" as "concocted, false[,] or made up." However, plaintiffs' denials regarding the sexual-harassment allegations and characterization of the allegations as false cannot create a triable question of fact regarding their claim for racial discrimination.

Plaintiffs appear to misconstrue the rules regarding summary disposition. Notably, the nonmoving party must, by affidavits and other admissible evidence, "set forth specific facts showing that there is a genuine issue for trial," and cannot rely on mere denials. MCR 2.116(G)(4). Further, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Town v Mich Bell Telephone Co*, 455 Mich 688, 704; 568 NW2d 64 (1997) (citation omitted). Instead, plaintiffs had to establish that the reason offered by defendants was pretext for discrimination "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Major*, 316 Mich App at 542. Plaintiffs, however, failed to satisfy any of these requirements for demonstrating pretext.

Plaintiffs failed to show defendants' reason for terminating them—the finding that they sexually harassed two female coemployees—had no basis in fact. *Id*. KS and KH directly testified concerning the harassment as did other persons. Thus, the defendants had evidence to support the finding that there was such harassment. Plaintiffs have not presented evidence that those statements were not believed by the defendants. Evidence was presented that FNG Detroit had a no-tolerance policy regarding sexual harassment and, if it occurred, it would result in the employee

being disciplined, which could include termination. Plaintiffs each signed a copy of the sexual-harassment policy articulating what constituted such harassment, and the punishment that could occur if such harassment took place. Therefore, plaintiffs failed to satisfy any of the requirements for demonstrating pretext. As a result, the trial court did not err in granting summary disposition of plaintiffs' claims regarding FNG Detroit.[2]

Moreover, the trial court concluded plaintiffs failed to prove discrimination by showing they were treated unequally to a similarly-situated employee who did not have the protected characteristic. As the trial court noted, plaintiffs failed to identify a non-Caucasian employee who, after being found to have violated the harassment policy, was not terminated. This conclusion was not erroneous. Indeed, the only evidence related to a similarly-situated individual established that no such individual existed. Specifically, Bopra's affidavit stated: "No other members of management at FNG Detroit were determined to have violated FNG Detroit's Harassment policy during Mr. Droomer's and Mr. Duke's employment." Plaintiffs failed to present any evidence to the contrary. Therefore, to the extent plaintiffs challenge this particular aspect of the trial court's findings, those findings were not erroneous.

## D. INDIVIDUAL LIABILITY OF CURTIS AND MACVICAR

Plaintiffs argue the trial court erred when it granted summary disposition of their claims against Curtis and MacVicar because, as agents of FNG Detroit, they could be subjected to individual liability. We disagree.

In *Elezovic v Ford Motor Co*, 472 Mich 408, 431; 697 NW2d 851 (2005), our Supreme Court held that "because employers can be held liable under the CRA, and because agents are considered employers, agents can be held liable, as individuals, under the CRA." In *Elezovic v Bennett (After Remand)*, 274 Mich App 1, 10; 731 NW2d 452 (2007), this Court held that an individual becomes an "agent" for purposes of the CRA, through "delegation of general supervisory power and authority." "Specifically, persons to whom an employing entity delegates supervisory power and authority to act on its behalf are agents, as distinguished from coemployees, subordinates, or coworkers who do not have supervisory powers or authority, for purposes of the CRA." *Id.* "Agents are persons to whom the employing agency delegates supervisory power and authority over subordinates" and "[a]n agent can be held directly and individually liable if he engaged in discriminatory behavior in violation of the CRA while acting in his capacity as the victim's employer." *Id.* at 15 (quotation marks omitted).

---

[2] To the extent plaintiffs argue FNG Detroit failed to promote Droomer and engaged in racial discrimination in doing so, plaintiffs failed to provide analysis of whether a prima facie case was established and have abandoned the issue. See *Houghton ex rel Johnson v Keller*, 256 Mich App 336, 339-340; 662 NW2d 854 (2003) (stating that "[a]n appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issues."). Plus, in any event, the assembly manager position was not filled until after Droomer was terminated, rendering him ineligible for the role, and Adelsberger had previously informed Droomer he was not being considered for promotion to that role because he needed additional leadership experience.

-10-

Here, the question is whether Curtis and MacVicar had "supervisory powers or authority to act" on behalf of FNG Detroit, with respect to the decision to terminate plaintiffs. MacVicar testified his only involvement during the investigation of the sexual-harassment allegations came when he sat in the initial meetings Curtis had with Droomer and Duke individually. Although plaintiffs contend MacVicar, as plant manager, had general supervisory authority and the power to hire and fire employees, Adelsberger testified that "[w]hen it's a company policy, code of ethics, that's strictly HR to provide that information." Curtis, on the other hand, conducted the sexual-harassment investigation and submitted his findings to Szalony who, in consultation with corporate HR, determined plaintiffs' employment should be terminated. Curtis testified he was not involved in the conversation regarding whether to terminate plaintiffs.

MacVicar was not an agent because the evidence does not establish that he had supervisory powers or authority to act on behalf of FNG Detroit with respect to the decision to terminate plaintiffs. *Id*. at 10. MacVicar's only involvement in that process was sitting in the meetings with Curtis as he met with plaintiffs individually. And, as Adelsberger noted, when an issue arose with respect to company policy, that issue was within the domain of HR. MacVicar was not a member of FNG Detroit's HR department. Thus, MacVicar was not an agent and the trial court did not err in dismissing plaintiffs' claims against him as an individual.

Whether Curtis constitutes an agent is more complicated. Curtis testified he was not involved in the conversation regarding whether to terminate plaintiffs, and the letter from Szalony indicates she communicated the decision to terminate to Curtis after that decision was made. However, Curtis had a supervisory role with respect to the decision to terminate plaintiffs because he conducted the investigation into the allegations made by KH and KS that led to plaintiffs' terminations. Under *Elezovic (After Remand)*, 274 Mich App at 10, one is considered an agent if the "employing entity delegates supervisory power and authority to act on its behalf . . . ." Thus, although the authority to investigate may not be the same as the authority to terminate, FNG Detroit delegated to Curtis the authority to act on its behalf in conducting the sexual-harassment investigation. *Id*. Therefore, we conclude Curtis was FNG Detroit's agent and could potentially be held individually liable to plaintiffs.

However, even though we conclude Curtis was FNG Detroit's agent, he is not individually liable. A determination that an individual is the agent of a company is not the end of the inquiry. Rather, in *Elezovic (After Remand)*, this Court stated that "[a]n agent can be held directly and individually liable if he engaged in discriminatory behavior in violation of the CRA while acting in his capacity as the victim's employer." *Elezovic (After Remand)*, 274 Mich App at 15. There is no evidence, or even allegations, that Curtis made any discriminatory remarks in this case. That is, plaintiffs did not present evidence that Curtis made any comments regarding terminating the employment of Caucasian employees so they could be replaced by African-American employees. As a result, Curtis could not be held individually liable because he did not engage in discriminatory behavior while acting in his capacity as plaintiffs' employer.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ David H. Sawyer
/s/ Deborah A. Servitto

-11-